Sharon LaCOMB, James A. Woolley and Phillip R. Krass, individually and on behalf of All Citizens and Voters of the State of Minnesota similarly situated, Plaintiffs,

v.

Joan GROWE, Secretary of State of Minnesota; Vernon T. Hoppe, Hennepin County Auditor; Charles R. Lefebvre, Anoka County Auditor; Thomas Hennen, Scott County Auditor; Carl D. Onishchuk, Dakota County Auditor, on behalf of themselves and all County Auditors of the State of Minnesota, Defendants,

Martin Johnson, William Savage, and Patricia Wirtanen, Intervenors,

Michael A. Hatch and Mary Monahan, Intervenors,

Seventy-Second Minnesota State Senate, Amicus Curiae.

No. 4–81 Civ. 152.

United States District Court, D. Minnesota, Fourth Division.

March 11, 1982.

Alan W. Weinblatt, Leonard & Weinblatt, St. Paul, Minn., for plaintiffs.

Warren R. Spannaus, Atty. Gen., and Douglas C. Blomgren and D. Douglas Blanke, Sp. Asst. Attys. Gen., St. Paul, Minn. for defendants Joan Growe, Charles R. Lefebvre, and Thomas Hennen.

Thomas L. Johnson, Hennepin County Atty., and James Bares, Asst. County Atty., Minneapolis, Minn., for defendant Vernon T. Hoppe.

Robert F. Carolan, Dakota County Atty., and James C. Backstrom, Asst. County Atty., Hastings, Minn., for defendant Carl D. Onishchuk.

Harold LeVander, Jr. and Daniel J. Beeson, LeVander, Gillen, Miller, Anderson & Kuntz, South St. Paul, Minn., intervenors Martin Johnson, William Savage, and Patricia Wirtanen.

John D. French, Faegre & Benson, Minneapolis, Minn., for intervenors Michael A. Hatch and Mary Monahan.

Before HEANEY, Circuit Judge, and MacLAUGHLIN and ALSOP, District Judges.

## MEMORANDUM OPINION

The above-entitled action was commenced by the plaintiffs, Sharon LaComb, James A. Woolley and Phillip R. Krass, on March 26, 1981. In September of 1981, the parties

entered into a stipulation which provided, *inter alia*, that the existing apportionment of legislative districts contravened the United States Constitution, Amendment XIV, Section 1, and the Minnesota Constitution, Article IV, Section 3.[1]

■ The Court has emphasized on several occasions that the responsibility for reapportioning the State lies with the legislative and executive branches of government. As the United States Supreme Court stated in *Chapman v. Meier*, 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975), "reapportionment is primarily the duty and responsibility of the State through its legislative or other body, rather than a federal court."

■ The Minnesota Legislature is empowered to reapportion the State by Article IV, Section 3, of the Minnesota Constitution. Because the Legislature has failed to fulfill its constitutional obligation to equitably reapportion the State, this Court must do so.

In performing this task, the Court has complied with the criteria set forth in its Order of December 29, 1981.

Pursuant to this Court's Order of November 16, 1981, three (3) Special Masters were appointed to "aid the Court in developing its reapportionment plan, and . . . not [to] independently prepare and submit a plan for the Court's approval." The Special Masters have fulfilled their responsibilities and have been of great assistance to the Court.

The controlling description of each senate and house district is set forth in a printout in Appendix A.* Appendices B, C, D, E, F, G, H and I are maps which outline the senate and house districts. If there are any variances between the descriptions in Appendix A and those in other sections or appendices of this opinion, Appendix A shall control.

## THE SENATE AND HOUSE DISTRICTS

■ The State of Minnesota has been divided into sixty-seven (67) senate districts, each of which is divided into two (2) of the one hundred thirty-four (134) house districts.

Thirty-four (34) senate districts and sixty-nine (69) house districts are entirely or predominately outside of the seven-county metropolitan area of Anoka, Carver, Dakota, Hennepin, Ramsey, Scott and Washington Counties (hereinafter "metropolitan area").

Thirty-two (32) senate districts and sixty-five (65) house districts are essentially within the metropolitan area. Six (6) senate districts and twelve (12) house districts are entirely in Minneapolis; four (4) senate districts and nine (9) house districts are entirely in St. Paul; seventeen (17) senate districts and thirty-four (34) house districts are in suburban Anoka, Hennepin, Ramsey and Washington Counties; three (3) senate districts and six (6) house districts are entirely within Dakota County; and Scott and Carver Counties are placed in a total of two (2) senate districts and three (3) house districts.

One (1) senate district contains one (1) house district which is within and one (1) which is outside of the metropolitan area.[2]

The population of Minnesota has increased by more than seven (7) percent since the census upon which the last apportionment of the State was based, thus increasing the average size of each legislative district by the same percentage. In addition, there have been several significant population movements, including the fol-

---

1. These constitutional violations result from population changes in the existing districts, which prevent those districts from accurately representing Minnesota's population, and which, if an election were held with the present district lines, would deprive citizens in many parts of the State of as effective a vote as other Minnesota citizens. *See Reynolds v. Sims*, 377 U.S. 533, 561–68, 84 S.Ct. 1362, 1381–1384, 12 L.Ed.2d 506 (1964).

* Appendices A–I have been deleted for purposes of publication.

2. In addition, Senate Districts 19, 22 and 25—which are predominantly non-metropolitan in character—include 8082, 6212 and 1911 metropolitan area residents, respectively, and Senate Districts 36, 42 and 49—which are predominantly metropolitan in character—include 664, 399 and 70 non-metropolitan area residents, respectively. *See* n.10, *infra*.

lowing: out of the Twin Cities; into the Twin Cities' suburbs;[3] out of the southwestern portion of the State; into the southeast and the central lake parts of the State.

Because minor civil divisions contain people with a community of interests and common local government, the Court gave the highest priority after population equality to respecting minor civil division boundaries. In Minneapolis, St. Paul and Duluth, the Court therefore formed house districts completely within city limits.[4]

As a result of its population loss,[5] the aforementioned increase in house and senate district size, and the Court's respect for municipal boundaries, Minneapolis—which contained all or part of eight (8) senate districts and sixteen (16) house districts in the previous apportionment plan—now will have six (6) senate districts and twelve (12) house districts completely within its boundaries. Similarly, St. Paul[6]—which had six (6) senate districts and twelve (12) house districts partly or completely within its boundaries—now will have nine (9) house districts and four (4) senate districts completely within its boundaries and one (1) senate district with approximately one-half (½) of its population in St. Paul. Duluth—which contained all or part of four (4) house districts—now will contain three (3) house districts completely within city limits.

A similar respect for municipal boundaries is evident elsewhere in the State, including St. Cloud and Rochester, which also are in the minimum possible number of house districts (two) within one senate district. With one exception,[7] every other municipality outside of the metropolitan area and Duluth—including Moorhead, Mankato, Winona, Austin, Hibbing, Albert Lea and Owatonna—is in a single house district.

Municipal boundaries in the suburban metropolitan area also are respected to the extent possible. Where division of a municipality between house districts was necessary, an attempt was made to include the portions of the municipality in a single senate district. Because of requirements of compactness and contiguity, it was necessary to divide some municipalities among more house and senate districts than the Court's population criterion alone required. For example, the population criterion dictates that Coon Rapids, with 35,826 people, be in at least two (2) house districts and one (1) senate district. However, because of compactness and contiguity requirements, Coon Rapids is in three (3) house districts and two (2) senate districts—one (1) more house and senate district than required by the Court's population criterion. Overall, Minnesota's municipalities are divided a total of twenty-seven (27) more times in the formation of house districts and twenty (20) more

3. Anoka County's population increased from 153,562 to 195,998 between the 1970 and 1980 census, during which time the Dakota County population increased from 138,613 to 194,279, the suburban Hennepin County population increased from 521,217 to 570,460, the suburban Ramsey County population increased from 164,971 to 189,554, and the Washington County population increased from 82,437 to 113,571.

4. The Court perceives no justification for drawing district lines which cross Minneapolis, St. Paul and Duluth boundaries, and as the United States Supreme Court stated in *Reynolds v. Sims*, 377 U.S. 533, 580–81, 84 S.Ct. 1362, 1391, 12 L.Ed.2d 506 (1964), there are several justifications for the preservation of political subdivision boundaries where feasible, consistent with approximate population equality:

Local governmental entities are frequently charged with various responsibilities incident to the operation of state government. In many states, much of the legislature's activity involves the enactment of so-called local legislation, directed only to the concerns of particular political subdivisions. And ... [the construction of] districts along political subdivision lines [deters] the possibilities of gerrymandering.

5. Between the taking of the 1970 and the 1980 censuses, the population of Minneapolis declined from 434,400 to 370,951.

6. Between the taking of the 1970 and the 1980 censuses, the population of St. Paul declined from 309,825 to 270,230.

7. In order to create a senate district containing St. Cloud, the municipality of Sartell was divided between Senate Districts 16 and 17.

times in the formation of senate districts than compliance with the Court's population criterion alone would require.[8]

Minneapolis and St. Paul generally are divided along recognized neighborhood lines. While it was not always possible to follow these lines exactly, the Court has attempted to join together identifiable neighborhoods with traditional ties.

Census data revealed significant minority populations in the Near North, Phillips and Powderhorn sections of Minneapolis and the Selby-Dale area of St. Paul. In an effort to increase the probability that the minorities living in these areas will be represented in the Legislature, the Court has formed three (3) house districts in Minneapolis and one (1) house district in St. Paul which include the bulk of those minority populations.[9] In addition, the Court has increased the probability of minority representation by creating a house district in Minneapolis which includes Minnesota's only Black legislator and much of his present constituency but does not include any other incumbent legislator.

As was noted at oral argument in this case, the seven-county metropolitan area consists of people with a community of state legislative interests different from those of non-metropolitan Minnesota citizens. The Court therefore attempted, where practicable, to include residents of the metropolitan area within districts entirely in the seven-county metropolitan area. Seven (7) districts contain portions of both the metropolitan and the non-metropolitan areas, but in four (4) cases this was mandated by respect for municipal boundaries that extend into or out of the metropolitan area.[10]

Because of the increase in the suburban metropolitan population, the Court's respect for Minneapolis and St. Paul boundaries, and the Court's attempt to respect both metropolitan and non-metropolitan communities of interest, the seven-county metropolitan area exclusive of the Twin Cities now will have twenty-two (22) senate districts and forty-four (44) house districts, whereas that area contained all or most of nineteen (19) senate districts and thirty-eight (38) house districts under the previous apportionment plan.

In certain instances, as a result of respecting political subdivision lines, the portion of a county into which a municipality extends is included in a district otherwise outside of the county.[11] Adherence to political subdivision lines where possible also has produced a few obvious, though minor, de-

8. By way of contrast, in the plans submitted by the parties and amicus curiae, municipalities are divided 46, 48, 53 and 57 more times in the formation of house districts than compliance with the Court's population criterion alone would require.

9. The St. Paul district (65A), with a 47.6% minority population that includes a 36.7% Black population, is similar to one proposed by the Urban Coalition of Minneapolis in a submission to the Court, Exhibit A to Memorandum in Support of Intervenor Hatch and Monahan's Reapportionment Plan. Census data reveals that the Black population of this district exceeds that of every St. Paul district proposed by the parties and amicus curiae.

The Minneapolis districts also resemble those proposed by the Urban Coalition of Minneapolis. District 57B has a 45.1% minority population that includes a 36.3% Black population; District 60A has a 31.9% minority population that includes an 11.9% Native American population and a 9.6% Black population; and District 60B has a 33.0% minority population that includes a 25% Black population.

10. District 19A contains 52,940 non-metropolitan residents and 8,082 metropolitan residents. District 22B contains 54,972 non-metropolitan residents and 5,832 metropolitan residents. District 36B contains 30,125 metropolitan residents and 664 non-metropolitan residents.

District 22A includes the 380 Rockford residents in Hennepin County in an otherwise non-metropolitan district. District 25B includes the 13 Northfield residents in Dakota County and the 1898 New Prague residents in Scott County in an otherwise non-metropolitan district. District 42A includes the 399 Hanover residents in Wright County in an otherwise metropolitan district. District 49A includes the 70 Dayton residents in Wright County in an otherwise metropolitan district.

11. The unorganized Territory of Nett Lake was treated as a minor civil division for redistricting purposes, and was placed in a single district.

viations from compactness.[12] Generally, these deviations reflect irregular boundaries of townships, counties or other political subdivisions. Because of the unavailability of necessary census data, it often would not have been possible to cross these irregular boundaries in any event.

In all cases, the Court respected both county and minor civil division boundaries where feasible. Forty-four (44) of the eighty (80) non-metropolitan counties were placed in a single senate district.

When two hundred and one districts are drawn within the fixed borders of the State, the last districts formed inevitably are less compact and have a less regular appearance than the others. The Court has attempted to minimize this "final districts" effect, which it was unable to eliminate entirely.

After drawing initial district lines for the State without reference to the residence of incumbents, the Court prepared a map which indicated the residence and political affiliation—but not the name—of each incumbent legislator. The Court then examined the initial district lines to determine whether any such lines unnecessarily separated an incumbent legislator from most of his or her constituents or unnecessarily joined two (2) or more incumbents in the same district. Although constituency-legislator relations[13] may not be entitled to great weight in a reapportionment plan, the Court finds that such relations are sufficiently significant to justify minor adjustments in district lines to place incumbent legislators in districts consisting largely of their former districts, or to avoid contests between present incumbents, when the tentative lines drawn were randomly selected. Accordingly, six (6) such minor adjustments were made.[14] None of the Court's criteria

12. Existing precinct lines were followed in many instances. However, in certain cases—and in all of Minneapolis in particular—census data by present precinct was not readily available. Moreover, precincts do not merit the same emphasis on boundary preservation as do political subdivisions.

13. The promotion of "constituency-legislator relations" signifies an attempt to maintain existing relationships between incumbent legislators and their constituents. See White v. Weiser, 412 U.S. 783, 791, 93 S.Ct. 2348, 2352, 37 L.Ed.2d 335 (1973). The legitimacy of drawing district lines to minimize contests between incumbents has been recognized by the United States Supreme Court. See Burns v. Richardson, 384 U.S. 73, 89 n.16, 86 S.Ct. 1286, 1295 n.16, 16 L.Ed.2d 376 (1966).

14. Senate District 2, which closely resembles the previous District 2, initially was divided into a northern and a southern house district, placing an incumbent Democratic-Farmer-Labor (DFL) representative and an incumbent Independent-Republican (IR) representative in the same house district. Because the district was divided into eastern and western house districts under the previous apportionment plan, and re-dividing the district along similar lines therefore would place two incumbent legislators with much of their present house districts instead of in a district together, the Court re-divided Senate District 2 into eastern and western house districts.

Senate District 22, as initially drawn, contained three townships and two municipalities in Winona County, including the township in which a female incumbent (IR) senator lives.

These townships and municipalities were added to District 34 so that the incumbent senator would be with many more of her present constituents. Under neither the initial nor the adopted plan would this incumbent have been in a district in which another incumbent senator resides.

Senate District 51 initially was divided into house districts along a line that passed two blocks south of the residence of an incumbent (DFL) house member, thereby joining him with another incumbent (DFL) representative in the southern district. This randomly selected line was adjusted to place the two incumbents in different districts, both of which contain most of the incumbents' present constituents.

St. Paul, as initially drawn, had three (3) incumbent (DFL) house members—including a Hispanic representative—in House District 65B, two incumbent (DFL) representatives in District 65A, and one in District 66A. To avoid the three-way contest in District 65B involving a Hispanic legislator, the southern edge of District 65A was moved southward several blocks in one area. The northern boundary of District 65A then was moved three blocks southward in another area to equalize population and avoid a three-way contest in that district. The net result was an increase in the likelihood that a Hispanic representative will be re-elected (in accordance with the Court's minority representation criterion), three districts with a more regular appearance, and a minimal decrease in the percentage of minority residents in District 65A.

Senate District 60 in Minneapolis originally was divided along 28th Street, which would

was sacrificed to make such adjustments, and on balance, the adjustments made on the basis of incumbents' residences appear to be neutral in their political impact.[15]

It appears that there is no incumbent senator presently residing in eleven (11) of the new senate districts, that there is one (1) incumbent senator residing in each of forty-five (45) of the new senate districts, and that there are two (2) incumbent senators presently residing in each of eleven (11) of the new senate districts. It also appears that there is no incumbent representative residing in nineteen (19) of the new house districts, that there is one (1) incumbent representative residing in each of ninety-six (96) of the new house districts, and that there are two (2) incumbent representatives residing in each of nineteen (19) of the new house districts.[16]

## CONCLUSION

In conclusion, we adopt the plan set forth in Appendix A,** *infra*, as a valid and constitutional apportionment plan for the Minnesota Legislature.

We continue to enjoin the defendants herein, including Joan Growe, Secretary of

---

have placed two incumbent female (DFL) representatives with the same surname (Clark) in the same district. Because the selection of 28th Street as a dividing line was random, the line was moved two blocks southward to the more natural dividing line of Lake Street, thereby separating the two incumbents.

Richfield with 37,000 people, initially was placed in two house districts, with approximately 30,000 Richfield residents comprising one district that included two incumbent (DFL) representatives (District 40A) and no incumbent representative in the district containing the remaining Richfield residents (District 40B). Because it was possible to modify the house dividing line to place one incumbent representative in a district with approximately 30,000 Richfield residents and the other incumbent in a district containing the remaining Richfield residents, the Court has done so.

In two other instances, Senate District 12 and Senate District 53, a concern for constituency-incumbent relations caused the Court to re-examine the districts as initially drawn, and revisions then were made in order to further compliance with the Court's criteria, rather than because of considerations of constituent-legislator relations.

In Senate District 12, as tentatively drawn, an east-west line split Otter Tail County into two house districts within the senate district, and two incumbent (IR) representatives were in the southern district (12B), with no incumbent representative in the northern district (12A). Upon re-examination and comparison to the plan submitted by the plaintiffs, it was discovered that a house district could be drawn to include the entire portion of Otter Tail County in the senate district, plus all of Wadena County, plus one township and one municipality in Todd County. This modification then was adopted because it furthered the plan's compliance with the criterion of respecting county boundaries where feasible, consistent with the population criterion.

As initially drawn, Senate District 53 included all of Shoreview and excluded one precinct of

Arden Hills. Because this resulted in an incumbent (IR) senator's separation from a majority of his present constituents, the district was re-examined. It was found that no minor adjustment of district lines would place the incumbent with a majority of his present constituents. However, it also was discovered that the adjoining district, District 52, would be more compact and have a more regular appearance if the precinct in Arden Hills was added to District 53 and a portion of Shoreview was added to District 52. This change then was made for reasons of compactness and appearance, rather than because of considerations of constituency-legislator relations.

In addition, House Districts 57A and 57B, as initially drawn, placed the State's only Black legislator in a district with a six-term legislator. Districts 57A and 57B were modified to avoid this, and thereby to increase the probability of Black representation in the Legislature, in accordance with one of the Court's criteria. The "displaced" legislator would have had a contest with an incumbent under either the tentative or the adopted plan, and under the plan adopted by the Court, he resides in a district containing more of his former constituents.

**15.** At oral argument in this case, counsel for some of the parties—including the Republican legislative intervenors, Johnson, Savage and Wirtanen—suggested that the Court utilize a test to determine whether a proposed or adopted plan is "politically fair." The Court has not done so.

**16.** Of the districts where two incumbents reside, the two are of different parties in six (6) senate and three (3) house districts; both are members of the DFL party in three (3) senate and eight (8) house districts; and both are members of the IR party in two (2) senate and eight (8) house districts.

** Deleted for purposes of publication.

State of the State of Minnesota, and all County Auditors of the State of Minnesota, from holding or conducting any future elections for the Minnesota Legislature under any apportionment plan except that which we adopt today or a constitutional plan adopted after this date by the State of Minnesota.

We order the 1982 legislative elections under the new apportionment plan to include contests for all positions—both house and senate—in the Minnesota Legislature. *See* Minnesota Constitution Article IV, Section 24.

We express our appreciation to the parties and amicus curiae in this action, to Earl Nordstrand and the Minnesota Land Management Information Center, to the Board of Regents of the University of Minnesota, to the Secretary of State and the Attorney General of the State of Minnesota, to the Metropolitan Council, to Dennis Brott of the Minnesota Department of Transportation, to Masters Allen Hinderaker, John S. Hoyt, Jr., and Andrew R. Kislik, and to court assistants Ron Schultz and Rosemary McQuaid for the assistance and cooperation they gave to the Court in this matter.

An Order taxing costs against Joan Growe, Secretary of State, will be entered at a later date for Masters' fees and expenses, assistants' fees and expenses, printing expenses, computer expenses and miscellaneous supplies and equipment.

ALSOP, District Judge, concurring.

Although I join in today's opinion, I write separately to express my concerns with certain of the procedures utilized.

Following full written submissions, responsive comments by all parties, and oral arguments of counsel, the court on December 29, 1981 issued its order setting forth the criteria to be used in considering and adopting a plan of reapportionment. The order provided that all districts be single member, be compact, be contiguous, preserve the voting strength of minority populations, respect boundaries of political subdivisions, and contain a given degree of population equality.

The Masters appointed by this court have worked long and hard at a difficult and tedious undertaking. They each have sincerely attempted to be faithful to their task of objectively and independently applying the written guidelines provided to them in the process of laying out the boundaries of the legislative districts of the State. The plan as finalized comports with the objective criteria adopted by the court for use in formulating a reapportionment plan and, therefore, I concur in its adoption.

The order of December 29, 1981 contained no mention that formulation of a plan by the court was to be determined in any way on the basis of the residences of incumbents or what "political impact" it might have. The absence of such criteria from the order was not inadvertent. The plaintiffs and intervenors Johnson, Savage and Wirtenan urged that the court's criteria not include consideration of the residences of incumbents. In concurring with the criteria as adopted, I wrote separately to state my views that "any plan meeting the stated criteria should not be reviewed by any further standard unless or until a statement thereof has been adopted by a majority of the court." No such statement was issued, however, until the reference in today's order that incumbent residency was used in the interests of "constituency-legislator relations" and "to avoid contests between present incumbents."

Whether or not incumbent residency is a legitimate and proper consideration in a judicially devised redistricting plan is open to legitimate differences of view. *See White v. Weiser,* 412 U.S. 783, 791, 93 S.Ct. 2348, 2352, 37 L.Ed.2d 335 (1973); *Burns v. Richardson,* 384 U.S. 73, 89 n.16, 86 S.Ct. 1286, 1295, n.16, 16 L.Ed.2d 376 (1966); *Skolnick v. State Electoral Board of Illinois,* 336 F.Supp. 839, 843 (N.D.Ill.1971). Nevertheless, since the court consciously chose not to publicly adopt incumbent residency as a stated criterion, in my judgment its use was inappropriate.

Further, I cannot agree that consideration was given to residences of incumbents

only after "initial district lines" were drawn. In at least two instances, suggestions or direction were given to the Masters as regards location of district boundaries or pairing of house districts based on incumbent residences before the drawing of "initial district lines." Moreover, this judge was invited to participate in a review of district boundaries based on residences of incumbents at a time before the Masters' "initial" lines were complete. Because of my view that any use of incumbent residency was inappropriate under the circumstances, I declined to participate in such a review at that time or thereafter.

In consideration of the adoption of criteria, some of the parties suggested that a final test be given to any plan proposed to make certain that it be "politically fair." Various techniques have been proposed for the formulation of an objective standard of measurement for what one would normally consider to be a purely subjective concept. *See* C. Backstrom, L. Robins & S. Eller, *Issues in Gerrymandering: An Exploratory Measure of Partisan Gerrymandering Applied to Minnesota*, 62 Minn.L.Rev. 1121 (1978). However, here again this court in its criteria order of December 29, 1981 consciously chose not to adopt such a standard in this case. Yet, today's opinion indicates that "adjustments made on the basis of incumbents' residences appeared to be neutral in their political impact." What standard was utilized in making that determination remains unknown. In my view, without some statement of the standard therefor, a judicial analysis of that consequence was inappropriate.

With these procedures, I must express my disagreement.