Sharon LaCOMB, James A. Woolley, and Phillip R. Krass, individually and on behalf of all citizens and voters of the State of Minnesota similarly situated, Plaintiffs,

v.

Joan GROWE, Secretary of State of Minnesota; Vernon T. Hoppe, Hennepin County Auditor; Charles R. Lefebvre, Anoka County Auditor; Carl D. Onishchuk, Dakota County Auditor, on behalf of themselves and all County Auditors of the State of Minnesota, Defendants,

Laverne Orwoll, Wilma Grams, David A. Broden, Donna Denkinger, Carrolyn Anderson, John Schnobrich, Henry Berghuis, Dorothy Nelson, Intervenors,

Seventy-Second Minnesota State Senate, Amicus Curiae.

Civ. No. 4-81-414.

United States District Court,
D. Minnesota,
Fourth Division.

March 11, 1982.

Alan W. Weinblatt, Leonard & Weinblatt, St. Paul, Minn., for plaintiffs.

Warren R. Spannaus, Atty. Gen., and Douglas C. Blomgren and D. Douglas Blanke, Sp. Asst. Attys. Gen., St. Paul, Minn., for defendants, Joan Growe, Charles R. Lefebvre, and Thomas Hennen.

Thomas L. Johnson, Hennepin County Atty., and James Bares, Asst. County Atty., Minneapolis, Minn., for defendant Vernon T. Hoppe.

Robert F. Carolan, Dakota County Atty., and James C. Backstrom, Asst. County Atty., Hastings, Minn., for defendant Carl D. Onishchuk.

Frank Hammond and Richard H. Kyle, Briggs & Morgan, St. Paul, Minn., for intervenors Laverne Orwoll, Wilma Grams, David A. Broder, Donna Denkinger, Carrolyn Anderson, John Schnobrich, Henry Berghuis and Dorothy Nelson.

Before HEANEY, Circuit Judge, and MacLAUGHLIN and ALSOP, District Judges.

## MEMORANDUM OPINION.

This Court is faced with the difficult and sensitive task of reapportioning the State of Minnesota into eight congressional districts of equal size. We face this task because the State Legislature has failed to perform it.

We must base our decision on one of two conflicting principles. The first is to protect the incumbent Congressmen. That end is accomplished by making only those changes in present district lines necessary to correct population inequities.

The second alternative is to afford equal representation to all regions of the State. That end is accomplished by recognizing the fact that one-half of the State's residents live in metropolitan Minnesota and one-half live in out-state Minnesota.

We have chosen the second alternative and adopt a plan with four districts in the metropolitan area and four districts out-state ("four-four" plan). We do so because this plan is most consistent with State constitutional and statutory policy. It groups together peoples with like needs and concerns. To do otherwise is to disperse approximately 460,000 metropolitan residents into various districts dominated by strong out-state majorities. That number is nearly sufficient to constitute its own congressional district.

### I.

All parties, including the State of Minnesota, agree that the present apportionment of congressional districts[1] violates Article I,

---

1. The eight congressional districts of the State    of Minnesota are currently apportioned pursu-

Section 2 of the United States Constitution. *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973). By Order dated September 15, 1981, the Court declared the present configuration of districts unconstitutional. They no longer equally apportion the population of Minnesota. Five of the districts underrepresent their residents by amounts that range from .79% to 9.92%. Those districts are the First, Second, Sixth, Seventh, and Eighth. Three of the districts overrepresent their residents by amounts that range from 7.08% to 16.38%. Those districts are the Third, Fourth, and Fifth.

■ Throughout these proceedings, the Court has repeatedly emphasized the responsibility of the legislative and executive branches of the State for congressional redistricting. Article IV, Section 3 of the Minnesota Constitution states in pertinent part:

At the first session after each enumeration of the inhabitants of this state made by the authority of the United States, the legislature shall have the power to prescribe the bounds of congressional and legislative districts.

The State has been urged to meet that responsibility. It has been given more than an adequate opportunity to do so. As stated in *Reynolds v. Sims*, 377 U.S. 533, 586, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506 (1964):

reapportionment is primarily a matter for legislative consideration and determination * * * judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so.

■ The State Legislature has failed to agree upon a plan of congressional redistricting. The House of Representatives has approved one plan and the Senate has approved a different plan. The differences between those plans are fundamental and unresolved. Consequently, the Court has been forced to undertake the task of redistricting.

Four redistricting plans have been submitted by the parties. The plaintiffs and the State Senate have each submitted one plan. The plan of the State Senate was passed by a partisan vote of the DFL majority. The Minnesota Independent Republican Congressional Delegation has submitted two plans. The first of those, Plan A, is a revision of the plan of the State House of Representatives. The second, Plan B, is an alternative submission prepared on behalf of the delegation. Both Plans A and B were prepared by the Director of Redistricting and Computer Services, Republican National Committee. Several additional plans were prepared by the Masters or individual members of the Court for study by the full Court. The Masters made no recommendations to the Court regarding which of the various plans they prepared best met constitutional requirements and the Court's adopted criteria.

The plans of the plaintiffs and the State Senate locate four of the eight congressional districts in metropolitan Minnesota. The seven-county metropolitan area constitutes 48.7% of the State's population. The remaining four districts are located in outstate Minnesota. Plan A of the Minnesota Independent Republican Congressional Delegation locates three districts in metropolitan Minnesota, one district is located outstate, and four districts combine out-state and metropolitan populations. In all instances the out-state population dominates the combined districts.[2] Plan B also locates three districts in metropolitan Minnesota, two districts are located out-state, and three districts combine out-state and metro-

---

ant to M.S.A. §§ 2.731–2.811. The apportionment of these districts followed the 1970 Census.

**2.** Under Plan A the populations of the combined districts are as follow:

| | Total Population | Metro Population | Percent Metro |
|---|---|---|---|
| District 1 | 509,474 | 181,628 | 35.6 |
| District 2 | 509,520 | 166,310 | 32.6 |
| District 6 | 509,476 | 11,261 | 2.2 |
| District 8 | 509,498 | 98,209 | 19.3 |

politan populations. Again, the out-state populations dominate the combined districts.[3]

## II.

■ After careful study, we adopt a plan of congressional redistricting that establishes four metropolitan districts and four out-state districts. Each district is virtually equal in population and compact. We adopt the plan for the following reasons:

1. The plan recognizes the fact, after the population changes of the last decade, that essentially one-half of the people of Minnesota live in the metropolitan area and one-half live in out-state Minnesota.

2. The plan best advances the State's Constitutional policy that districts be "of convenient contiguous territory." Minnesota Constitution, Article IV, Section 3. It does so by:

a. Preserving rather than splitting the natural grouping of the metropolitan residents in the formation of districts. It recognizes to the extent possible the community of interests that metropolitan residents share. It recognizes to the same extent the community of interests shared by the out-state residents.

b. Forming districts that are compact.

3. The plan best advances the State's statutory policy to recognize the metropolitan area as a distinct region of the State with unique governmental concerns. *See, e.g.,* Minn.Laws 1957, Ch. 468 (creating a comprehensive planning agency for the region); Minn.Laws 1967, Ch. 892 (creating

the metropolitan transit commission); Minn.Laws 1971, Ex.Sess. Ch. 24 (creating metropolitan revenue distribution); *Lifteau v. Metropolitan Sports Facilities Commission,* 270 N.W.2d 749, 756 (Minn.1978) (Metropolitan Council is a political subdivision of the State); *City of New Brighton v. Metropolitan Council,* 306 Minn. 425, 428, 237 N.W.2d 620, 623 (1975) (same).

4. The plan is consistent with the principles employed in the apportionment of legislative districts in the companion case *Sharon La Comb et al. v. Joan Growe, Secretary of State of Minnesota, et al.,* 541 F.Supp. 160. In both instances, every effort was made to preserve rather than dilute the effective representation of people with like needs and concerns. In the metropolitan area, we deliberately confined the legislative districts to the boundaries of the seven-county area wherever possible without breach of the other criteria adopted by the Court. Within that seven-county area, in turn, we made every effort to confine districts to municipal boundaries. The urban and suburban communities of interest were accorded strong recognition. The out-state area, consequently, was also accorded strong recognition as a broad community of interest within which the Court preserved county, township, and municipal boundaries to the maximum extent possible. Neither the legislative nor the congressional plan was drawn to protect incumbents.[4]

5. The plan best meets the criteria adopted by the Court for congressional redistricting.[5]

---

3. Under Plan B the populations of the combined districts are as follows:

| | Total Population | Metro Population | Percent Metro |
|---|---|---|---|
| District 1 | 509,534 | 181,688 | 35.6 |
| District 2 | 509,577 | 181,221 | 35.6 |
| District 8 | 509,501 | 98,212 | 19.3 |

4. The few minor changes made in the boundaries of legislative districts to serve the interests of incumbents are detailed in note fourteen of the legislative plan filed this date. We repeat here that two incumbent Senators reside in each of eleven of the new senate districts and two incumbent Representatives reside in each

of nineteen of the new house districts. In addition, there will be thirty open seats.

5. By Order dated December 29, 1981, the Court adopted the following criteria:

1. The eight congressional districts shall be as nearly equal in population as possible. The maximum permissible deviation from population equality is plus or minus one-quarter of one percent (.25%) or 1,274 people.

2. The districts shall be single member, compact, and contiguous.

3. The districts shall preserve political subdivisions in the formation of districts.

4. The districts shall preserve the voting strength of minority population and, wherever

Although we adopt a "four-four" plan, we do not accept the precise plans of either the plaintiffs or the State Senate. Neither plan minimizes population deviations from equality nor maximizes the compactness of districts. As stated in *White v. Weiser*, 412 U.S. 783, 790, 93 S.Ct. 2348, 2352, 37 L.Ed.2d 335 (1973):

> The command of Article I, § 2, that representatives be chosen "by the People of the several States" was elucidated in *Wesberry v. Sanders* * * * to permit only those population variances among congressional districts that "are unavoidable despite a good-faith effort to achieve absolute equality[.]"

Moreover, both plans contain features apparently designed to achieve political ends.[6]

The plan we adopt closely follows the "four-four" plan prepared by the Masters at the request of the full Court. It is faithful to the principle of affording equal representation to all regions of the State, it minimizes population deviations from equality, and it is compact. A map of the Court's plan is attached as Appendices B and C.* A smaller map of the plan is attached to the opinion for the reader's convenience as Figure I. The controlling description of each district is contained in Appendix A. If there are any variances, the descriptions in Appendix A control.

The ideal congressional district is 509,496 people. Under the Court's plan, the maximum deviation from ideal or equality is 36 people. That is .00706%. This is better than any plan submitted by the parties.[7] The total population deviation is 76 and the

average deviation is 9.5. Again, this is better than any plan submitted by the parties.[8]

The metropolitan districts are the Third, Fourth, Fifth, and Sixth. With the exception of 64,129 people, principally from Wright and Sherburne Counties, they are wholly within the seven-county metropolitan area. To the extent these districts go outside of the metropolitan region, they include close contiguous areas to maximize compactness. It was necessary to include some out-state people because the metropolitan area is 1.3% short of being exactly 50% of the State's population. The Fourth and Fifth districts locate the principal cities of the State, Minneapolis and Saint Paul, in different districts, contrary to Plan B of the Independent Republican Congressional Delegation. The First, Second, Seventh, and Eighth districts are out-state in character.

The districts are compact. Because they separately group the metropolitan population and the out-state population, they are necessarily more compact than the plans of the Minnesota Independent Republican Congressional Delegation. Under the delegation's Plan A, seven of the eight districts draw on the metropolitan area. Consequently, districts extend from north of Grand Marais to Coon Rapids, from the Iowa border to Forest Lake and to Eagan, and from extreme southwestern Minnesota on the South Dakota and Iowa borders to Wayzata continuing north to East Side Township in Mille Lacs County. For the same reason, its Plan B is not as compact as reasonably possible. Districts extend from

---

possible, increase the probability of minority representation from areas of sizable concentrations of minority population.
The Court further ordered that communities of interest could be preserved in the formation of districts.

**6.** For example, both plans would place Itasca and Koochiching county into the Seventh Congressional District.

\* Appendices A–F deleted for purposes of publication.

**7.** The maximum population deviation of the parties' plans is:

| | |
|---|---|
| Plaintiffs | 1,219 |
| State Senate | 1,188 |
| Plan A | 41 |
| Plan B | 110 |

**8.** The total and average population deviations of the parties' plans is:

| | Total | Average |
|---|---|---|
| Plaintiffs | 5,098 | 637 |
| State Senate | 5,198 | 650 |
| Plan A | 138 | 17 |
| Plan B | 350 | 44 |

extreme northeastern Minnesota to White Bear Lake, from the Iowa border to Forest Lake and to Shorewood, and from extreme southwestern Minnesota to the top of Mille Lacs County. These districts neither comply with the Minnesota Constitutional mandate of districts of "convenient contiguous territory" nor the Court's criterion of compactness.

The proponents of Plans A and B argue for their adoption on the basis that they reflect State policy regarding congressional districts. *White v. Weiser,* 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973), is cited in support of the argument. In that case, the Supreme Court held:

> Just as a federal district court, in the context of legislative reapportionment, should follow the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution, we hold that a district court should similarly honor state policies in the context of congressional reapportionment. *Id.* at 795, 93 S.Ct. at 2354.

The Court adopts its plan because it best honors discernible State policy.

It is the State's policy, expressed by constitutional provision, that districts be "of convenient contiguous territory". Minnesota Constitution, Article IV, Section 3. The word "convenient" is defined in *The Compact Edition of the Oxford English Dictionary* (Oxford University Press 1971) to mean:

1. Agreeing (in opinion); in accord.

2. Accordant, contiguous consonant.

7. Within easy reach; easily accessible.

It is defined in *Webster's New International Dictionary (Second Edition Unabridged)* to mean:

1. Fit or adopted; suitable; congruous; commensurate; appropriate; becoming; proper.

The Court's plan best serves that State policy. It groups persons with like needs and concerns by recognizing the communities of interest within the State. In addition, it is the most compact. Plans A and B admittedly divide metropolitan Minnesota into more districts than required by the population of the region. Also, they are not compact.

It is the State's policy, expressed by statutory provisions, to recognize the like needs and concerns of the residents of metropolitan Minnesota. The seven-county metropolitan area is a distinct region afforded unique treatment by the Legislature. The Court's plan preserves the effective representation of the residents of this area. Moreover, because of the statutory recognition of the region as a community of interest, the Court's configuration of congressional districts into convenient contiguous territory is pursuant to State legislative guidance. Plans A and B admittedly are in conflict with these purposes.

The plans of the Minnesota Independent Republican Congressional Delegation have the effect of disenfranchising a substantial number of metropolitan residents from congressional representation whenever their interests conflict with those of out-state Minnesota. This occurs in the districts which combine metropolitan and out-state residents because, in every instance, the out-state population dominates. The extent of dominance ranges from 64.4% to 97.8%. Surely, the effective representation of the metropolitan residents of the combined districts is diluted by Plans A and B or similar plans. The Court cannot adopt a plan with that consequence in the absence of a showing that it serves important State interests. The showing that has been made demonstrates that that consequence disserves important State interests.

Unfortunately, we do not have the benefit of a plan found appropriate by the elected members of the two houses of the State Legislature. We do not have a current expression of the State's political prefer-

ences regarding the complicated redistricting process. For those reasons, the situation presented is unlike the one faced by the Court in *White v. Weiser, supra.* Instead of a contemporaneous decision by the State which resolves the competing political demands of incumbents and political parties, we have two statements, one from each house of the Legislature, that sharply conflict. Accordingly, we look for and find our guidance in State policy free of the political overtones inherent in redistricting.

Minnesota's delegation of Independent Republican Congressmen would have us find the State's policy in the existing congressional district configurations. They ask us to make only minimal changes from the current district lines.[9] The delegation asserts it is the State's policy to leave smaller rural counties united and to split larger urban counties. They also argue that minimal change from current district configurations will avoid voter confusion.

Certainly, the current configuration of the congressional districts splits urban counties more than rural ones. That is an accurate observation of fact. There is nothing, however, to suggest that fact was a policy which guided the 1971 Legislature when it created those districts. The enacting statutes, M.S.A. §§ 2.731–2.811, give no support to the claim.[10] We do not base our decision on the political compromises of redistricting of past decades. We base it on the constitutional and statutory statements of State policy.

Minimizing voter confusion is, of course, desirable. Any redistricting plan presents the opportunity for some confusion. Consequently, the Court, like the proponents of

Plans A and B, takes as the starting point the last configuration of congressional districts. The districts are modified only to serve State policy and satisfy the constitutional mandate that one person's vote shall equal another's.

The Court has been guided by and has applied the enduring, articulated policies of the State. Upon the Legislature's default on its responsibility, the Court has undertaken the redistricting task affirmatively and positively.

### III.

We continue to enjoin the defendants, including Joan Growe, Secretary of State of Minnesota, from holding or conducting any future elections for Congress under any apportionment plan except that which we adopt today or a constitutional plan adopted after this date by the State of Minnesota.

We express our appreciation to the parties and intervenors, to the staff of the Minnesota Department of Land Management, to the Board of Regents of the University of Minnesota, to the Secretary of State and the Attorney General of the State of Minnesota, to Masters John S. Hoyt, Jr., Andrew R. Kislik, and Allen Hinderaker, and to Court assistants Ron Schultz and Rosemary McQuaid for the assistance and cooperation they gave to the Court in this matter.

Appropriate orders taxing costs against Joan Growe, Secretary of State, will be entered for Masters' fees and expenses, assistants' fees and expenses, printing expenses, computer expenses and miscellaneous supplies and equipment.

**9.** In fact, the needed changes are not "minimal." In order to achieve equal apportionment, 27,578 people must be removed from the First District; 42,284 people must be removed from the Second District; 36,066 people must be added to the Third District; 49,679 people must be added to the Fourth District; 83,432 people must be added to the Fifth District; 44,778 people must be removed from the Sixth District; 4,023 people must be removed from the Seventh District; and 50,514 people must be removed from the Eighth District.

**10.** The Court's plan splits a minimum number of out-state counties. Seventy-three of the out-state counties remain intact and seven are split.

FIGURE I

ALSOP, District Judge, dissenting.

Today a majority of this court adopts a plan of congressional reapportionment which totally alters the basic configuration of congressional districts in the State of Minnesota as it has existed for twenty years. The majority bases its decision on what it describes as this court's choice between the "two conflicting principles" of "protect[ing] incumbent Congressmen" or affording "equal representation to all regions of the State." I cannot concur with the majority's statement of this court's duty, with the majority's rationale, nor with its result.

The responsibility of this court is to fashion and promulgate a congressional redistricting plan for the State of Minnesota that does the following:

1. Comports with the constitutional requirements of equal representation for each citizen and makes certain that the vote of one Minnesota citizen is equal to that of every other, United States Constitution, Article I, § 2;

2. Is consistent with the apportionment policy of the State of Minnesota, *White v. Weiser*, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973); and

3. Conforms with the criteria for reapportionment as adopted by this court in its Order of December 29, 1981.

Fulfilling this responsibility does not, as the majority asserts, require a choice between "protect[ing] incumbent Congressmen" or affording "equal representation to all regions of the State."

The plan adopted by the majority unquestionably makes drastic and constitutionally unnecessary changes in the existing districts established by the Minnesota Legislature in 1971. The majority's plan creates four districts in the Twin Cities metropolitan area and four in the remainder of the State. The plan was chosen from among four plans submitted by the parties, a four-four plan created by the special masters, a minimal change plan[1] created by the Special Masters, and two plans created by Judge Gerald W. Heaney. When compared with the plans submitted by the parties, the plan adopted most closely resembles the plan submitted by the DFL-controlled State Senate. Although its out-state boundaries closely correspond to the four-four plan prepared by the Masters, it contains significant differences in the metropolitan area. For the reasons set forth more fully below, I respectfully dissent to the plan adopted today by the majority and propose, as a better alternative, the Masters' minimal change plan.[2]

Once the existing congressional apportionment plan was declared unconstitutional, this court unquestionably had broad power to fashion a constitutional plan; however, the remedial powers of an equity court are not unlimited. *Whitcomb v. Chavis*, 403 U.S. 124, 161, 91 S.Ct. 1858, 1878, 29 L.Ed.2d 363 (1971).

Just as a federal district court, in the context of legislative reapportionment, should follow the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution, we hold that a district court should similarly honor state policies in the context of congressional reapportionment. In fashioning a reapportionment plan or in choosing among plans, a district court should not pre-empt the legislative task nor "intrude upon state policy any more than necessary."

*White v. Weiser*, 412 U.S. at 795, 93 S.Ct. at 2354. Thus, the Supreme Court has made it clear that this court should adopt a reapportionment plan that respects State policy.

---

1. A minimal change plan makes only minor changes in the existing districts in order to achieve population equality.

2. A description and maps of the Masters' minimal change plan are attached in Appendices D, E and F. [These appendices have been deleted for publication purposes.]

In *White v. Weiser*, the three-judge district court declared unconstitutional a Texas law (S.B.1.) providing for congressional redistricting based upon the 1970 census figures. The parties submitted two alternative plans for the district court to consider: Plan B, although cutting across more county lines, generally followed the district lines of S.B.1.; Plan C, using population as the only consideration, substantially disregarded the existing districts of S.B.1. The district court ordered the implementation of Plan C because it was more compact and contiguous.

The Supreme Court upheld the finding that S.B.1. was unconstitutional but reversed the district court as to which alternative plan should have been adopted. The rationale of the Court is directly applicable in this case, and thus is quoted here at length.

> Plan B, as all parties concede, represented an attempt to adhere to the districting preferences of the state legislature while eliminating population variances. Indeed, Plan B achieved the goal of population equality to a greater extent than did Plan C. Despite the existence of Plan B, the District Court ordered implementation of Plan C, which, as conceded by all parties, ignored legislative districting policy and constructed districts solely on the basis of population considerations. The District Court erred in this choice. Given the alternatives, the court should not have imposed Plan C, with its very different political impact on the State. It should have implemented Plan B, which most clearly approximated the reapportionment plan of the state legislature, while satisfying constitutional requirements. The court said only that Plan C is "significantly more compact and contiguous" than Plan B. But both Plan B and Plan C feature contiguous districts, and, even if the districts in Plan C can be called more compact, the District Court's preferences do not override whatever state goals were embodied in S.B.1 and, derivatively, in Plan B. "The remedial powers of an equity court must be adequate to the task, but they are not unlimited. *Here the District Court erred in so broadly brushing aside state apportionment policy without solid constitutional or equitable grounds for doing so."*

*White v. Weiser*, 412 U.S. at 796, 93 S.Ct. at 2355 (emphasis added).

Today the majority is also brushing aside State apportionment policy. Minnesota has had eight congressional districts for twenty years. The first congressional redistricting following the determination that Minnesota was entitled to eight districts occurred in 1961. *See* Laws 1961, 2d ex. session, ch. 2, §§ 1–9. Following the 1970 census, the Minnesota Legislature adopted the second redistricting plan for the eight districts, *see* Laws, 1971 ch. 897, which is the plan that was in effect at the time this lawsuit was filed. Minn.Stat. §§ 2.73–2.82 (1980). Each of the two plans was passed by the Minnesota House of Representatives and Senate and approved by the Governor. Neither was the subject of constitutional challenge.

A comparison of the 1961 and 1971 plans shows great similarities.[3] Although modifications were made to reflect population shifts, the basic geographical makeup of the eight districts was maintained. It appears that the Minnesota Legislature followed existing lines wherever possible in creating the new districts in 1971.

A State apportionment policy to preserve existing congressional district lines can be readily derived from looking at three factors. First, the current congressional plan in effect at the time this lawsuit was filed was drafted by the Legislature and is of the same configuration as has been in effect for 20 years. It stands as the Legislature's most recent statement of policy on the subject of

---

**3.** See Figures 2 and 3 following the text of this opinion.

congressional districts. Second, the existing plan appears to have been drafted by the Legislature in recognition of the previously existing districts. Finally, a minimal change plan has been recently passed by the DFL-controlled Minnesota House of Representatives with bipartisan support on a 104–24 vote.[4] *See Skolnick v. State Electoral Board of Illinois,* 336 F.Supp. 839, 846 (N.D. Ill.1971) (the court should give deference to a redistricting plan passed by one chamber of the legislature with bipartisan support). These three factors taken together clearly demonstrate a State policy in congressional redistricting which, under the Supreme Court mandate in *White,* we must follow.

The rationale behind limiting a court's equitable powers by the requirement that it not intrude upon State policy is to avoid even the appearance of arbitrariness or gerrymandering. In reapportionment, "the court's task is inevitably an exposed and sensitive one that must be accomplished circumspectly, and in a manner 'free from any taint of arbitrariness or discrimination.'" *Connor v. Finch,* 431 U.S. 407, 415, 97 S.Ct. 1828, 1834, 52 L.Ed.2d 465 (1977).

In this case, the majority of the court has chosen to adopt an apportionment plan that is radically different from any plan ever in effect in this State. Even assuming that its adoption was not politically motivated, the plan will in all likelihood have radical political ramifications. *See* C. Backstrom, L. Robins & S. Eller, *Issues in Gerrymandering: An Explanatory Measure of Partisan Gerrymandering Applied To Minnesota,* 62 Minn.L.Rev. 1121, 1131 (1978); *Connor v. Finch,* 431 U.S. at 430, 97 S.Ct. at 1841 (Blackmun, joined by Burger; concurring). Such a result from a judicial body is inappropriate when that which causes it is unnecessary.

The best way for this court to have limited its entanglement in the politics of con-

gressional reapportionment, would have been to use existing congressional district lines in adopting a new plan. "Where there is an established policy of respecting political or natural boundaries in districting then . . . a court may best avoid any appearance of partisanship by using those boundaries as much as possible in its districting." *Id.*

The United States Supreme Court has reversed court ordered reapportionment plans that intruded upon an established state policy. *See, e.g., White v. Weiser,* 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973); *Sixty-Seventh Minnesota State Senate v. Beens,* 406 U.S. 187, 92 S.Ct. 1477, 32 L.Ed.2d 1 (1972); *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). Ten years ago, the Supreme Court overturned this court's decision in *Beens v. Erdahl,* 336 F.Supp. 715 (D.Minn.1972), reducing the size of the Minnesota Legislature in its court-ordered plan. The Supreme Court had no difficulty in discerning the state's policy as to the Legislature's size and, because of that policy, held that this court was not justified in so drastically reducing the number of senators and representatives. *Sixty-Seventh Minnesota State Senate v. Beens,* 406 U.S. at 197, 92 S.Ct. at 1484.

In the case before us today, there similarly is no reason to make such a drastic change in the configuration of existing districts. The special Masters created a minimal change plan which meets the adopted criteria but also respects existing district boundaries.[5] This plan has a minimal effect on the voters of this State in that it leaves all but approximately 300,000 of them in their current districts. The majority's plan, however, moves innumerable voters into different districts of entirely new configurations. The court could have avoided doing unnecessary violence to the heart of existing districts by adopting a

---

**4.** The four-four plan submitted by the Senate-intervenor passed the Senate by a 40–23 vote. The vote, however, was along strict party lines with only two Independent Republicans voting

in favor, one of whom did so to assure IR representation on any conference committee.

**5.** See Figure 4 following the text of this opinion.

minimal change plan such as the one prepared for the court by the Masters. *See Maryland Citizens Committee For Fair Congressional Redistricting v. Tawes*, 253 F.Supp. 731, 734 (D.Md.1966).

As set forth in my concurrence in the companion case involving legislative reapportionment, *LaComb v. Growe*, 541 F. Supp. 160 (D.Minn.1982), there are legitimate differences of opinion as to whether or not incumbent residency may properly be considered in devising any judicial reapportionment plan. However, in my view, its use is inappropriate where the court has chosen not to publicly adopt incumbent residency as a stated criterion.

In the legislative reapportionment case, my fellow judges, forming a majority of this court, attempted to preserve constituency-legislator relations by drawing "district lines to place incumbent legislators in districts consisting largely of their former districts, or to avoid contests between present incumbents." It is noteworthy that they have abandoned that standard in congressional redistricting. Indeed, in the congressional plan adopted by the majority, it appears that at least two out of the eight election contests will be between incumbent congressmen. Thus, of eight incumbents, at least four will be involved in incumbency races. If the majority had used incumbent residency to minimize incumbency contests in congressional redistricting, as was done in legislative redistricting, a minimal change plan would have been the logical choice. A minimal change plan leaves each incumbent congressman in his existing district and does so without changing the constituency of the district to an appreciable degree. The plan adopted by the majority effectively destroys existing constituency-representative relations and results in "contests between present incumbents."

In the context of congressional reapportionment, the Supreme Court has intimated

that in considering the constitutionality of a plan, it is proper to consider whether the plan promotes " 'constituency-representative relations,' a policy frankly aimed at maintaining existing relationships between incumbent congressmen and their constituents and preserving the seniority the members of the state's delegation have achieved in the United States House of Representatives." *White v. Weiser*, 412 U.S. at 791, 93 S.Ct. at 2352. The majority's plan does neither; a minimal change plan does both.

The rationale advanced by the majority in support of its apportionment plan cannot withstand close analysis.

The first reason given for adopting a four-four plan is that such a plan "recognizes the fact, after the population changes of the last decade, that essentially one-half of the people of Minnesota live in the metropolitan area and one-half live in out-state Minnesota." The majority correctly notes that the seven-county metropolitan area currently constitutes 48.7% of the State's population. It should also be noted that, in 1970, the seven-county metropolitan area consisted of 49.3% of the State's population.[6] Furthermore, in 1971, with 49.3% of the State's population in the metropolitan area, the State Legislature did not deem it necessary to adopt a congressional reapportionment plan based upon four metropolitan districts and four out-state districts. Yet, today, the majority attempts to premise the judicial establishment of such a plan on the basis of a proportional metropolitan population which is actually less than that which existed in 1970.

The majority contends that its plan "best advances the State's Constitutional policy that districts be 'of convenient contiguous territory.' " That portion of Minnesota Constitution, Article IV, Section 3, which is cited in support of that reason applies, by its terms, to State legislative districts, not to congressional districts.[7]

---

**6.** Based on the 1970 census data, the combined population of Anoka, Carver, Dakota, Hennepin, Ramsey, Scott and Washington Counties was 1,874,612 and the population of the State was 3,806,103.

**7.** Minnesota Constitution, Article IV, Section 3, reads as follows:

> At its first session after each enumeration of the inhabitants of this state made by the

The majority also attempts to find a State statutory policy to recognize the metropolitan area as a distinct region of the State for purposes of reapportionment. However, none of the authorities cited for that proposition relate in any way to congressional reapportionment. *See* Majority opinion at p. 148. In addition, the statutory references are to laws which either predated or were adopted the same year as the congressional reapportionment by this State's Legislature in 1971. Clearly, any weight that might have been attached to those laws as an expression of State apportionment policy was lost when the Legislature itself did not recognize the metropolitan area in reapportioning the congressional districts. For these reasons, I remain convinced that the most clearly established State reapportionment policy is to follow existing congressional district lines to the fullest extent possible.

Finally, the majority contend that in adopting their plan "every effort was made to preserve rather than dilute the effective representation of people with like needs and

concerns" as was done in the companion case, *LaComb v. Growe,* 541 F.Supp. 160 (D.Minn.1982). While I agree that such a rationale may be deserving of some weight in State legislative reapportionment, it is not so deserving in the context of congressional reapportionment,[8] since "congressional districts are not so intertwined and freighted with strictly local interests as are state legislative districts." *White v. Weiser,* 412 U.S. at 793, 93 S.Ct. at 2353.

By reason of the failure of the Minnesota Legislature to fulfill its constitutional responsibility to properly apportion this State's congressional districts, the task has fallen to the judiciary and specifically to this court. This shift of responsibility, however, does not grant to the judiciary an unrestricted license to desecrate existing boundaries and ignore established State policy. The plan today adopted by the majority does just that. The result is a congressional reapportionment plan that is judicially unprecedented and constitutionally unnecessary.

I respectfully dissent.

---

authority of the United States, the legislature shall have the power to prescribe the bounds of congressional and legislative districts. *Senators shall be chosen by single districts of convenient contiguous territory.* No representative district shall be divided in the formation of a senate district. The senate districts shall be numbered in a regular series. [Emphasis added.]

8. A "dichotomy between the two lines of cases has consistently been maintained." *Mahan v. Howell,* 410 U.S. 315, 322, 93 S.Ct. 979, 984, 35 L.Ed.2d 320 (1973).

FIGURE 2

1971 Congressional Districts

FIGURE 3

1982 Masters' Minimal Change

FIGURE 4