Sara HIPPERT, Dave Greer, Linda Markowitz, Dee Dee Larson, Ben Maas, Gregg Peppin, Randy Penrod and Charles Roulet, Individually and on Behalf of all citizens and voting residents of Minnesota similarly situated, Plaintiffs,

and

Kenneth Martin, Lynn Wilson, Timothy O'Brien, Irene Peralez, Josie Johnson, Jane Krentz, Mark Altenburg, and Debra Hasskamp, Individually and on Behalf of all citizens of Minnesota similarly situated, Plaintiffs–Intervenors,

and

Audrey Britton, David Bly, Cary Coop, and John McIntosh, Individually and on Behalf of all citizens of Minnesota similarly situated, Plaintiffs–Intervenors,

v.

Mark RITCHIE, Secretary of State of Minnesota; and Robert Hiivala, Wright County Auditor, individually and on behalf of all Minnesota county chief election officers, Defendants.

No. A11–152.

Supreme Court of Minnesota, State of Minnesota Special Redistricting Panel.

Feb. 21, 2012.

FINAL ORDER ADOPTING A LEGIS-
LATIVE REDISTRICTING PLAN

### ORDER

On January 21, 2011, plaintiffs Sara Hippert et al. (the Hippert plaintiffs) filed this action in Wright County District Court, alleging that the current Minnesota congressional and legislative election districts are unconstitutional under the United States and Minnesota constitutions in light of the 2010 census. The Hippert plaintiffs subsequently petitioned Minnesota Supreme Court Chief Justice Lorie S. Gildea to appoint a special redistricting panel to hear and decide the case. On June 1, 2011, pursuant to her authority under Minnesota law, the Chief Justice appointed this panel and directed us to order implementation of judicially determined redistricting plans "only in the event that the Legislature and Governor have not in a timely manner enacted redistricting plans that satisfy constitutional and statutory requirements." *Hippert v. Ritchie*, No. A11–152, at 3 (Minn. June 1, 2011) (Order of Chief Justice); *see also* Minn.Stat. §§ 2.724, subd. 1, 480.16 (2010) (providing that Chief Justice has authority to assign any judge to serve and discharge duties of judge of any court).

The statutory date for completion of congressional and legislative redistricting in this decennium is February 21, 2012. *See* Minn.Stat. §§ 204B.14, subd. 1a ("It is

the intention of the legislature to complete congressional and legislative redistricting activities ... in no case later than 25 weeks before the state primary election in the year ending in two."), 204D.03, subd. 1 (setting the state primary election "on the second Tuesday in August in each even-numbered year") (2010). That date has arrived, and a legislative redistricting plan has not been enacted.[1] Because the electoral process must not be delayed, the panel now addresses the constitutionality of the election districts for the Minnesota Senate and the Minnesota House of Representatives.

## I.

■ Minnesota has 67 state senate districts and 134 state house districts. Minn. Stat. §§ 2.021, 2.031, subd. 1 (2010). Each senate district contains exactly two house districts. Minn. Const. art. IV, § 3; Minn. Stat. § 2.021. The United States Constitution and the Minnesota Constitution require the state's legislative districts to be substantially equal in population. *See* U.S. Const. amend. XIV, § 1; Minn. Const. art. IV, § 2 ("The representation in both hous-

es shall be apportioned equally throughout the different sections of the state in proportion to the population thereof"); *Chapman v. Meier*, 420 U.S. 1, 26–27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975) (stating that a court-created redistricting plan for a state legislature "must ordinarily achieve the goal of population equality with little more than *de minimis* variation" from the ideal district population); *Reynolds v. Sims*, 377 U.S. 533, 568, 84 S.Ct. 1362, 1385, 12 L.Ed.2d 506 (1964) ("The Equal Protection Clause demands no less than substantially equal state legislative representation for all citizens....").[2] Therefore, the ideal population of a senate district after the 2010 census is 79,163, and the ideal population of a house district is 39,582.[3] Minnesota's total population increased by 7.8 percent during the last decade, but this growth was not uniform. Hearings Before Minn. H.R. Redistricting Comm. (Marshall, Minn. Feb. 11, 2011) (testimony of Tom Gillaspy, Minnesota State Demographer). As a result, Minnesota's legislative districts are not equal in population. For example, the Senate District 20 established ten years ago,[4] located

---

1. The Governor vetoed the legislative redistricting plan passed by both houses of the Minnesota Legislature. *See* State of Minnesota, *Journal of the House,* 87th Sess. 4984 (May 23, 2011). Accordingly, that plan was never enacted into law. *See Sixty–Seventh Minn. State Senate v. Beens,* 406 U.S. 187, 195, 92 S.Ct. 1477, 1483, 32 L.Ed.2d 1 (1972) (stating that Governor's veto nullified Legislature's efforts to fulfill its redistricting obligations).

2. In accordance with the requirement of minimal population variance, and consistent with the redistricting criteria of previous special redistricting panels, this special redistricting panel set the maximum population deviation for a legislative district at two percent from the ideal district population. *Hippert*, No. A11–152, at 8 (Minn. Special Redistricting Panel Nov. 4, 2011) (Order Stating Redistricting Principles and Requirements for Plan Submissions); *see Zachman,* No. C0–01–160, at 3 (Minn. Special Redistricting Panel Dec.

11, 2001) (Order Stating Redistricting Principles and Requirements for Plan Submissions); *Cotlow v. Growe,* No. MX–91–1562, at 4 (Minn. Special Redistricting Panel Aug. 16, 1991) (Pretrial Order No. 2).

3. Minnesota's 2010 census population is 5,303,925. Kristin D. Burnett, U.S. Dep't of Commerce, Econ. & Statistics Admin., U.S. Census Bureau, *Congressional Apportionment: 2010 Census Briefs* 2 (Nov.2011) (table), http://www.census.gov/prodicen2010/briefs/c2010br-08.pdf. We calculate the ideal population for a senate district by dividing the state's total population by 67. We calculate the ideal population for a house district by dividing the state's total population by 134.

4. Unless otherwise indicated, district numbers refer to the districts established by this order.

in the western part of the state along the Minnesota River, is underpopulated by 12,-347 people (a negative deviation of 15.6 percent from the ideal); and the Senate District 35 established ten years ago, located in Scott County, is overpopulated by 29,401 people (a positive deviation of 37.1 percent from the ideal). Minn. Dep't of Admin., Office of Geographic & Demographic Analysis, Office of the State Demographer, *2010 Population Counts by Minnesota Senate District* (Mar. 16, 2011) (table) [hereinafter *2010 Senate District Population Counts*], http://www.demography.state.mn.us/resource.html?Id=31944. For example, the House District 20A established ten years ago, located in several counties on the western border of Minnesota, is underpopulated by ·7,395 people (a negative deviation of 18.7 percent from the ideal); and the House District 35A established ten years ago, located in Scott County, is overpopulated by 20,290 people (a positive deviation of 51.3 percent from the ideal). Minn. Dep't of Admin., Office of Geographic & Demographic Analysis, Office of the State Demographer, *2010 Population Counts by Minnesota House District (Mar.* 16, 2011) (table), http://www.demography.state.mn.us/resource.html?Id=31948. We, therefore, hold that the population of the State of Minnesota is unconstitutionally malapportioned among the state's current legislative districts established following the 2000 census in *Zachman v. Kiffmeyer,* No. C0-01–160 (Minn. Special Redistricting Panel Mar. 19, 2002) (Final Order Adopting a Legislative Redistricting Plan).

## II.

■ The ordinary remedy for this constitutional defect is for the Minnesota Legislature to redraw the state's senate and house districts to better reflect the state's population. *See* Minn. Const. art. IV, § 3 ("At its first session after each enumeration of the inhabitants of this state made by the authority of the United States, the legislature shall have the power to prescribe the bounds of congressional and legislative districts."); *Georgia v. Ashcroft,* 539 U.S. 461, 488 n. 2, 123 S.Ct. 2498, 2515 n. 2, 156 L.Ed.2d 428 (2003) ("When the decennial census numbers are released, States must redistrict to account for any changes or shifts in population."). Traditional redistricting is performed through the legislative process, and the redistricting plan is enacted into law only after it is passed by the Legislature and signed by the Governor. *Beens,* 406 U.S. at 195, 92 S.Ct. at 1483.

■ The February 21, 2012 statutory deadline has arrived, and the Legislature and Governor have not enacted a legislative redistricting plan. *See* Minn.Stat. § 204B.14, subd. 1a. Therefore, it is the role of the state judicial branch to prepare a valid legislative plan and order its adoption. *See, e.g., Growe v. Emison,* 507 U.S. 25, 34, 113 S.Ct. 1075, 1081, 122 L.Ed.2d 388 (1993) (holding that Minnesota Special Redistricting Panel's issuance of a redistricting plan, which was conditioned on the Legislature's failure to enact a constitutionally acceptable plan, is "precisely the sort of state judicial supervision of redistricting" that the United States Supreme Court has encouraged).

■ When the judicial branch performs redistricting, it lacks the political authority of the legislative and executive branches and, therefore, must act in a restrained and deliberative manner to accomplish the task. *Connor v. Finch,* 431 U.S. 407, 415, 97 S.Ct. 1828, 1834, 52 L.Ed.2d 465 (1977) (stating that courts lack the "political authoritativeness" that legislatures bring to redistricting and that a court's task "is inevitably an exposed and sensitive one that must be accomplished

circumspectly, and in a manner free from any taint of arbitrariness or discrimination" (quotation omitted)); *see also Perry v. Perez,* 565 U.S. ——, ——, 132 S.Ct. 934, 941, 181 L.Ed.2d 900, —— (2012) (per curiam) (stating that "redistricting ordinarily involves criteria and standards that have been weighed and evaluated by the elected branches in the exercise of their political judgment" and that courts are "ill suited" to make such policy judgments). To this end, the panel has established and utilized politically neutral redistricting principles that advance the interests of the collective public good and preserve the public's confidence and perception of fairness in the redistricting process. *Hippert,* No. A11–152, at 7–9 (Minn. Special Redistricting Panel Nov. 4, 2011) (Order Stating Redistricting Principles and Requirements for Plan Submissions). These redistricting principles include: (1) drawing districts with a maximum deviation of two percent from the ideal population; (2) drawing districts without the purpose or effect of denying or abridging the voting rights of any United States citizen on account of race, ethnicity, or membership in a language minority group, U.S. Const. amends. XIV, XV; Voting Rights Act of 1965, as amended, 42 U.S.C. §§ 1973–1973aa–6 (2006); (3) drawing districts that consist of convenient, contiguous territory structured into compact units, Minn. Const. art. IV, § 3; Minn.Stat. § 2.91, subd. 2 (2010); *Reynolds,* 377 U.S. at 568, 84 S.Ct. at 1385; (4) drawing districts that respect political sub-divisions, Minn.Stat. § 2.91, subd. 2 (2010); (5) preserving communities of interest;[5] and (6) drawing districts without the purpose of either protecting or defeating incumbents. *Hippert,* No. A11–152, at 7–9 (Minn. Special Redistricting Panel Nov. 4, 2011) (Order Stating Redistricting Principles and Requirements for Plan Submissions).

The panel applied these neutral redistricting principles in performing its task. The plaintiffs to this action—the Hippert plaintiffs, plaintiffs—intervenors Kenneth Martin et al., and plaintiffs-intervenors Audrey Britton et al.—submitted proposed redistricting plans for the panel's consideration. Although certain elements from each proposed redistricting plan are reflected in the panel's legislative plan, no proposed plan was adopted in its entirety.

### III.

The panel gathered information from a variety of sources to assist it in creating new legislative districts.

The parties to this action submitted proposed redistricting criteria, and each group of plaintiffs to this action submitted proposed legislative redistricting plans for the panel's consideration. The Hippert plaintiffs' proposed plan, which reflects in substantial part the Legislature's plan that the Governor vetoed, was considered on an equal footing with the proposed plans of the other parties to this action.[6] Written

---

**5.** For purposes of this redistricting principle, "communities of interest" include, but are not limited to, groups of Minnesota citizens with clearly recognizable similarities of social, geographic, political, cultural, ethnic, economic, or other interests. *Hippert,* No. A11–152, at 9 (Minn. Special Redistricting Panel Nov. 4, 2011) (Order Stating Redistricting Principles and Requirements for Plan Submissions); *see also League of United Latin Am. Citizens v. Perry,* 548 U.S. 399, 433, 126 S.Ct. 2594, 2618, 165 L.Ed.2d 609 (2006) (stating that "maintaining communities of interest" is a traditional redistricting principle (quotation omitted)).

**6.** We observe that the United States Supreme Court recently held that a federal district court, when creating an interim congressional redistricting plan to be used during the pendency of preclearance proceedings under Section 5 of the Voting Rights Act, should defer

briefs also were submitted, and the parties to this action participated in oral argument on redistricting criteria and the proposed plans.

Robust and diverse public input also informed the redistricting process. The panel received and considered the record of the Redistricting Committee of the Minnesota House of Representatives, including the transcripts of the committee's deliberations and the testimony and exhibits received by the committee during a series of statewide public hearings held in February 2011. The panel also held eight public hearings across the state in October 2011. *See Hippert,* No. A11–152, at 3–4 (Minn. Special Redistricting Panel Sept. 13, 2011) (Amended Order Setting Public Hearing Schedule). In addition to live public testimony, the panel invited and received written comments and maps from members of the public via United States Mail and e-mail. *See id.* at 5–6.

All of these sources of information were helpful in bringing to light unique features of local communities. For example, the panel received comments addressing the sovereignty and interests of federally recognized Indian tribes. *See, e.g.,* Hearings Before Minn. Special Redistricting Panel 8–12, 16–19, 39–42 (Bemidji, Minn. Oct. 11, 2011). The panel received comments on municipal annexations, regional shared educational and other governmental services, and the work of regional development commissions. *See, e.g., id.* at 17, 47 (Minneapolis, Minn. Oct. 6, 2011); 23–26, 32–36 (Bemidji, Minn. Oct. 11, 2011); 12–13 (Moorhead, Minn. Oct. 12, 2011). The panel also received comments about communities of interest that span counties, communities of interest that exist within a

single county or among several county subdivisions, and communities of interest—such as neighborhoods and planning districts—that exist within a single municipality. *See, e.g., id.* at 13, 15, 26–27, 31–32, 40–41 (Bloomington, Minn. Oct. 4, 2011); 28–31, 45, 49–51, 58 (Minneapolis, Minn. Oct. 6, 2011); 9–10, 26–27 (Cloquet, Minn. Oct. 10, 2011); 11–13, 17–18, 45 (Mankato, Minn. Oct. 14, 2011). We are heartened by and grateful for the level of civic engagement reflected in the public's participation in the hearing-and-comment process, and we favorably acknowledge the assistance provided.

## IV.

Because courts engaged in redistricting lack the authority to make the political decisions that the Legislature and the Governor can make through their enactment of redistricting legislation, the panel utilizes a least-change strategy where feasible. *Cf. LaComb v. Growe,* 541 F.Supp. 145, 151 (D.Minn.1982) (stating that the "starting point" for new, court-drawn congressional districts is the last configuration of districts, "modified only to serve State policy and satisfy the constitutional mandate that one person's vote shall equal another's"). For example, the Senate District 46 established ten years ago, composed of Brooklyn Center and the southern portion of Brooklyn Park, is underpopulated by 4,073 people. *2010 Senate District Population Counts.* By slightly adjusting the preexisting split of Brooklyn Park so that the city is divided along 85th Avenue North, the panel creates Senate District 40, which has a population within 100 people of the ideal. The panel also uses a least-change strategy to

---

to the redistricting plan that has been duly enacted by the state's legislative and executive branches of government. *Perry,* 565 U.S. at ——, 132 S.Ct. at 941–43. But because the

Minnesota Legislature's redistricting plan was never enacted into law, it is not entitled to such deference.

create Senate District 14, which continues to be centered on Saint Cloud and now includes the remainder of that city, by altering the boundaries of the Senate District 15 established ten years ago. Likewise, by altering only the preexisting split of South Saint Paul to adjust the population of the Senate District 39 established ten years ago, the panel employs a least-change approach to create Senate District 52. The panel also uses this strategy when expanding the boundaries of Senate District 07, located entirely within the city of Duluth, to encompass more of that city.

Because of population shifts within the state, however, sometimes a least-change approach is not possible. For example, a new configuration of legislative districts in northern Minnesota is necessary because the 2010 census determined that Senate Districts 01, 02, 03, 05, 06, and 07—as established ten years ago—are substantially underpopulated. *See id.* Despite this reconfiguration in northern Minnesota, it is possible to keep the Iron Range primarily within a single senate district and to retain a senate district within the city of Duluth. For the converse reason—substantial overpopulation—the fast-growing suburban and exurban communities in the eleven-county metropolitan area[7] make reconfiguration necessary in those communities.[8]

■ One benefit of a least-change strategy is that it minimizes voter confusion. Voter confusion is also minimized by the Minnesota Constitution's mandate that senate districts be numbered in a regular series. *See* Minn. Const. art. IV, § 3. The new legislative districts satisfy this constitutional mandate, but the panel directs the public's attention to the fact that the new districts are numbered in a different manner than the districts that were established ten years ago. This is unavoidable. It has been the convention during the past forty years to number the seven-county "metropolitan area" (the counties of Anoka, Carver, Dakota, Hennepin, Ramsey, Scott, and Washington) after numbering the rest of the state. *See, e.g., Zachman,* No. C0–01–160, at 4 (Minn. Special Redistricting Panel Dec. 11, 2001) (Order Stating Redistricting Principles and Requirements for Plan Submissions). But since redistricting last occurred, the Legislature amended the Minnesota Election Law by enacting a definition of "metropolitan area" that includes eleven counties. 2005 Minn. Laws ch. 156, art. 6, § 13, at 1713 (defining "[m]etropolitan area" as "the counties of Anoka, Carver, Chisago, Dakota, Hennepin, Isanti, Ramsey, Scott, Sherburne, Washington, and Wright"), *codified at* Minn.Stat. § 200.02, subd. 24. Because the Minnesota Election Law applies to all elections held in this state

---

7. *See* Minn.Stat. § 200.02, subd. 24 (2010) (defining "[m]etropolitan area" as "the counties of Anoka, Carver, Chisago, Dakota, Hennepin, Isanti, Ramsey, Scott, Sherburne, Washington, and Wright").

8. During the past decade, Anoka County's population increased by 11.0 percent; Carver County's population increased by 29.7 percent; Chisago County's population increased by 31.1 percent; Isanti County's population increased by 20.9 percent; Scott County's population increased by 45.2 percent; Sherburne County's population increased by 37.4 percent; Washington County's population increased by 18.4 percent; and Wright County's population increased by 38.6 percent. Minn. Dep't of Admin., Office of Geographic & Demographic Analysis, Office of the State Demographer, *Minnesota Population Change by County 1990–2010* (Mar. 16, 2011) (table), http://www.demography.state.mn.us/resource.html?Id=31945. By comparison, the state's population as a whole increased by 7.8 percent. Hearings Before Minn. H.R. Redistricting Comm. (Marshall, Minn. Feb. 11, 2011) (testimony of Tom Gillaspy, Minnesota State Demographer).

unless otherwise specifically provided by law, Minn.Stat. § 200.015 (2010), the numbering convention now reflects an eleven-county metropolitan area. *Hippert,* No. A11–152, at 7, 17–18 (Minn. Special Redistricting Panel Nov. 4, 2011) (Order Stating Redistricting Principles and Requirements for Plan Submissions).

## V.

The legislative districts established here satisfy all of the redistricting criteria set forth in the panel's November 4, 2011 order. There are 67 senate districts and 134 house districts. Minn.Stat. §§ 2.021, 2.031, subd. 1. No house district is divided in the formation of a senate district. Minn. Const. art. IV, § 3. The legislative districts are numbered in a regular series. *Id.*

### Population Equality

██ The legislative districts satisfy the constitutional mandate of substantial population equality with de minimis variation. *See* U.S. Const. amend. XIV, § 1; Minn. Const. art. IV, § 2; *Chapman,* 420 U.S. at 26–27, 95 S.Ct. at 766; *Reynolds,* 377 U.S. at 568, 84 S.Ct. at 1385. No legislative district's population deviates by more than two percent from the population of the ideal district. *See Hippert,* No. A11–152, at 8 (Minn. Special Redistricting Panel Nov. 4, 2011) (Order Stating Redistricting Principles and Requirements for Plan Sub-

missions). The largest negative deviation from the ideal for a senate district is 0.61 percent; the largest positive deviation is 0.82 percent. App'x B██ The largest negative deviation from the ideal for a house district is 0.75 percent; the largest positive deviation is 0.86 percent. *Id.* The mean deviation from the ideal for the senate districts created by the panel is 0.21 percent. *Id.* The mean deviation from the ideal for the house districts created by the panel is 0.29 percent. *Id.*[9]

### Statutory Requirements

██ The legislative districts comprise convenient, contiguous territory structured into compact units. *See* App'xs C–D, F; ██ *see also Hippert,* No. A11–152, at 8 (Minn. Special Redistricting Panel Nov. 4, 2011) (Order Stating Redistricting Principles and Requirements for Plan Submissions). They also respect political subdivisions, which minimizes voter confusion and gives political subdivisions a stronger voice.[10] *See* App'xs E–F; ██ *see also* Minn.Stat. § 2.91, subd. 2 (stating that political subdivisions shall not be divided more than necessary to meet constitutional requirements). Accordingly, many of the new districts are composed entirely of intact political subdivisions. For example, the northwest counties of Kittson, Marshall, Pennington, Polk, Red Lake, and Roseau

---

9. The reports appended to this order were either produced using the most recent version of Maptitude for Redistricting (Maptitude) available to the panel (Version 6.0 Build 975) or were produced using data generated by that software. *See Hippert,* No. A11–152, at 4, 12–13 (Minn. Special Redistricting Panel Nov. 4, 2011) (Order Stating Redistricting Principles and Requirements for Plan Submissions) (specifying software to be used by the panel and reports to be submitted by the parties to this action).

10. Because subdivisions were split ten years ago in creating the legislative districts, a least-change strategy results in more subdivision splits than those that might result from districts created without regard for preexisting legislative boundaries. (When a city or township is split on a county boundary, such as Blaine, which is split between Anoka and Ramsey counties, Maptitude does not count it as a split.)

compose Senate District 01.[11] The counties of Aitkin and Crow Wing compose Senate District 10. The Scott County municipalities of Credit River, Jackson, Jordan, Louisville, Prior Lake, Saint Lawrence, Sand Creek, Shakopee, and Spring Lake compose Senate District 55. The southeastern counties of Fillmore and Houston compose House District 28B.

Creating districts that respect political subdivisions sometimes results in districts that lack neat and tidy shapes and edges. For example, the boundary between House Districts 13A and 13B in Avon Township has an irregular appearance because it follows, in certain locations, a political-subdivision boundary that is not a straight line.

 Because respecting political subdivisions is a criterion subordinate to the constitutional mandate of substantial population equality, some subdivision splits are inevitable.[12] Where practicable, the panel splits political subdivisions along thoroughfares, rivers, neighborhood boundaries, or other geographic features. For example, Hutchinson is divided along Minnesota State Highway 15 between House Districts 18A and 18B; and North Branch is divided along Interstate Highway 35 between House Districts 32A and 32B.

It is often possible to avoid a subdivision split while ensuring that a district's population does not deviate by more than two percent from the ideal. For example, House District 04A contains the city of Moorhead, portions of Moorhead Township, and all of Oakport Township, the latter of which will be annexed by the city of Moorhead in 2015. *See* Hearings Before Minn. Special Redistricting Panel 12–13 (Moorhead, Minn. Oct. 12, 2011). The district's population deviates from the ideal by 310 people (0.78 percent). To create a house district with a smaller deviation, Oakport Township could be split. But the requirements of both substantial population equality and respect for political subdivisions are better met by keeping Oakport Township whole and creating a house district with a deviation that—although it could be made smaller—is well within the two-percent maximum. The same reasoning applies to the creation of Senate District 34, which consists of the Hennepin County municipalities of Dayton,[13] Hassan,[14] Maple Grove, Osseo, and Rogers and deviates from the ideal population by 648 people (0.82 percent). Rather than splitting a political subdivision to obtain a smaller deviation from the ideal population, the panel creates a district that respects subdivision boundaries and is well within the two-percent deviation maximum.

---

11. This district is identical to the Senate District 01 in each of the three proposed plans submitted to the panel by the parties to this action.

12. For example, 12 counties and the state's 5 largest cities must be split because their populations are larger than that of the ideal senate district. An additional 11 counties and 15 cities must be split because their populations are larger than that of the ideal house district. Of the 2,754 cities, townships, and unorganized territories in Minnesota, 45 (1.6 percent) are split in the panel's senate plan and 89 (3.2 percent) are split in the panel's house plan. *See* App'xs E–F. [Editor's Note: Appendices E–F omitted for purposes of publication.]

13. The portion of Dayton that is located in Wright County is not included in Senate District 34.

14. The city of Rogers completed the annexation of Hassan Township during the pendency of this action. *See* City of Rogers Admin. Dep't, *Rogers–Hassan to Merge January 1, 2012*, http://www.cityofrogers.org/government/departments/administration/815-rogers-hassan-to-merge-january-1-2012.

### Minority Populations

The legislative districts were not drawn with either the purpose or effect of denying or abridging the voting rights of any United States citizen on account of race, ethnicity, or membership in a language minority group. They comply with the United States Constitution and the Voting Rights Act. U.S. Const. amends. XIV, XV; 42 U.S.C. §§ 1973–1973aa–6. The legislative districts prevent the disconnection of minority populations living in compact areas, such as American Indians living in the Little Earth of United Tribes Community in Minneapolis; minority populations living in Rochester; and minority populations living in certain Minneapolis neighborhoods, Saint Paul planning districts, and Saint Paul communities, such as Rondo. The legislative districts also prevent the disconnection of minority populations living in the agricultural communities of greater Minnesota. Because of the substantial growth of Minnesota's minority populations during the past decade, and because the new districts follow the boundaries of political subdivisions, neighborhoods, and communities, minority groups throughout Minnesota have increased opportunities to influence their legislators. See U.S. Census Bureau, *2010 Census Results: Minnesota* (chart of state population change by race), http://www.demography.state.mn.us/Census2010/; *see also, e.g.,* Hearings Before Minn. Special Redistricting Panel 10, 33, 39 (Saint Paul, Minn. Oct. 5, 2011); 20, 23–24, 42, 52–53 (Minneapolis, Minn. Oct. 6, 2011); 35 (Mankato, Minn. Oct. 14, 2011). Minority groups also may have an increased ability to elect legislators of their choice, should they choose to vote together in certain districts. *See* App'x G.■

### American Indian Reservations

The legislative districts demonstrate a respect for the reservation boundaries of federally recognized Indian tribes. *See, e.g.,* Hearings Before the Minn. Special Redistricting Panel 12, 14–19, 41 (Bemidji, Minn. Oct. 11, 2011); Letter from Marge Anderson, Chief Executive, Mille Lacs Band of Ojibwe, to Rep. Sarah Anderson, Chair, Minn. H.R. Redistricting Comm. (Mar. 2, 2011); Letter from Norman Deschampe, President, Minn. Chippewa Tribe, to Rep. Sarah Anderson, Chair, Minn. H.R. Redistricting Comm. (Mar. 2, 2011). Most of the reservation lands of the Red Lake Nation are in House District 02A; House District 02B encompasses the reservation lands of the White Earth Nation. House District 03A encompasses the reservation lands of the Grand Portage Band of Lake Superior Chippewa and most of the reservation lands of the Bois Forte Band of Chippewa. House District 05A encompasses the reservation lands of the Leech Lake Band of Ojibwe.[15] Most of the reservation lands of the Fond du Lac Band of Lake Superior Chippewa are in House District 11A. Most of the reservation lands of the Mille Lacs Band of Ojibwe are in House District 15A. The reservation lands of the Upper Sioux Community are in House District 16A; the reservation lands of the Lower Sioux Indian Community are in House District 16B. Most of the reservation lands of the Prairie Island Indian Community are in House District 21A. The reservation lands of the Ho–Chunk Nation are in House District 28B. The reservation lands of the Shakopee Mdewakanton Sioux Community are kept

---

**15.** The western border of the Leech Lake Reservation does not align with the county boundary between Cass and Hubbard. The boundary between Senate Districts 02 and 05 follows the reservation boundary. As a result, four townships are split.

intact within a single senate district, and all but a small portion containing zero population is in House District 55B.

## Communities of Interest

When doing so does not abridge other redistricting criteria, the new districts accommodate communities of interest. In the northeast, the Iron Range is primarily kept intact within a senate district. *See, e.g.,* Hearings Before Minn. Special Redistricting Panel 31–34 (Cloquet, Minn. Oct. 10, 2011) (emphasizing interconnected nature of Iron Range communities). In the northwest, the Red River Valley continues to be placed in as few legislative districts as is practicable. *See, e.g., id.* at 22–23 (Moorhead, Minn. Oct. 12, 2011) (emphasizing the need for shared flood protection). Moorhead and Detroit Lakes continue to share a senate district. *See, e.g., id.* at 15–17 (describing strong ties between Moorhead and Detroit Lakes). In the south, Mankato, North Mankato, and Saint Peter continue to share a senate district. *See, e.g., id.* at 21–26, 78–79 (Mankato, Minn. Oct. 14, 2011) (describing connections between these communities). Also in the south, the bulk of Rochester continues to be in two adjacent house districts (now numbered as House Districts 25B and 26A), with portions in two additional house districts (now numbered as House Districts 25A and 26B).[16]

To accommodate communities of interest, Senate District 39 in the east includes many of the Washington County municipalities on the Saint Croix River. *See, e.g.,* Hearings Before Minn. Special Redistrict-

ing Panel 21–22, 35–36 (Saint Paul, Minn. Oct. 5, 2011) (addressing common interests of the Saint Croix River Valley). For similar reasons, in the north metropolitan area, no portion of Elk River (in Sherburne County) remains in a senate district with the Anoka County municipalities of Ramsey and Anoka. Rather, Elk River is placed with cities and townships that, unlike Ramsey and Anoka, are not under the jurisdiction of the Metropolitan Council. *See* Minn.Stat. § 473.121, subd. 2 (2010) (defining area over which the Metropolitan Council has jurisdiction); *see also, e.g.,* Hearings Before the Minn. Special Redistricting Panel 29 (Saint Cloud, Minn. Oct. 13, 2011) (emphasizing neighborhood and planning-district boundaries).

In Minneapolis and Saint Paul, where population decreases require legislative districts to expand, part of each city is placed in a senate district with one or more adjacent suburbs. The senate and house districts in Minneapolis and Saint Paul, however, continue to preserve neighborhood and planning-district boundaries to the greatest extent practicable. *See, e.g.,* Hearings Before the Minn. Special Redistricting Panel 13, 15, 2627, 31–32, 40–41 (Bloomington, Minn. Oct. 4, 2011); 28–31, 45, 49–51, 58 (Minneapolis, Minn. Oct. 6, 2011).

## Impact on Incumbents

 Finally, "[l]egislative districts shall not be drawn for the purpose of protecting or defeating incumbents." *Hippert,* No. A11–152, at 9 (Minn. Special Redistricting Panel Nov. 4, 2011) (Order

---

16. The panel considered creating a Rochester-centered senate district, surrounded by a senate district consisting mainly of greater Olmsted County. *See, e.g.,* Hearings Before Minn. Special Redistricting Panel 54–55 (Mankato, Minn. Oct. 14, 2011); *cf. Cotlow,* No. MX–91–1562, at 27–31 (Minn. Special Redistricting Panel Dec. 9, 1991) (Findings of Fact, Conclusions of Law, and Order for

Judgment on Legislative Redistricting) (describing Rochester-centered senate district surrounded entirely by another senate district). But such an approach would have decreased the compactness of greater Olmsted County's house districts and would have been inconsistent with the panel's least-change strategy.

Stating Redistricting Principles and Requirements for Plan Submissions). As a factor subordinate to all redistricting criteria, however, the panel may consider the impact of redistricting on incumbent officeholders to determine whether a plan results in either undue incumbent protection or excessive incumbent conflicts. *Id.* To assess this impact, the panel examined the number of districts that pose an incumbent conflict—that is, districts where more than one incumbent legislator resides.[17] The constitutional purpose of legislative redistricting is to establish election districts of equal population so that each Minnesotan has equal voting power when selecting a representative.[18] Applying neutral redistricting principles, we have done so.

 We observe that in a constitutional democracy, election districts do not exist for the benefit of any particular legislator. Neither do those districts exist for the benefit of any political party. Rather, election districts exist for the people to select their representatives. Having considered the number of incumbent conflicts involving female legislators, legislators of the same political party, and legislators of different parties, the panel concludes that the senate and house districts do not result in either undue incumbent protection or excessive incumbent conflicts. This legislative redistricting plan satisfies the mandates of the United States Constitution and the Minnesota Constitution, the statutory requirements for redistricting, and traditional redistricting criteria while advancing the interests of the collective public good.

## VI.

Because the existing legislative districts are unconstitutional for purposes of the 2012 primary and general elections, we enjoin their use in these elections and hereby adopt the state senate and house boundaries set forth in Appendices A and H to this order.█ Defendants shall conduct elections utilizing the legislative districts adopted in this order or any constitutional legislative plan subsequently enacted by the Minnesota Legislature and the Governor of the State of Minnesota.[19]

BY THE PANEL:

/s/Wilhelmina M. Wright
Presiding Judge

/s/Ivy S. Bernhardson

/s/Edward I. Lynch

/s/James B. Florey

/s/John R. Rodenberg

## APPENDIX A

---

**17.** This analysis is based on publicly available data.

**18.** *See Connor,* 431 U.S. at 416, 97 S.Ct. at 1834 ("The Equal Protection Clause requires that legislative districts be of nearly equal population, so that each person's vote may be given equal weight in the election of representatives. It was recognition of that fundamental tenet that motivated judicial involvement in the first place in what had been called the 'political thicket' of legislative apportionment." (citation omitted)).

**19.** Secretary of State Mark Ritchie is hereby provided a block-equivalency file and a copy of this order to facilitate the implementation of this legislative plan. Should any ambiguity arise regarding the plan set forth in this order, the Secretary of State is directed to act in accordance with Minn.Stat. §§ 2.91, subds. 2–3, 204B.146, subd. 3 (2010).

## 2012 Minnesota Special Redistricting Panel
## Minnesota State Legislative Districts - Statewide
## February 21, 2012

2012 Minnesota Special Redistricting Panel
Minnesota State Legislative Districts - Metropolitan Area
February 21, 2012

2012 Minnesota Special Redistricting Panel
Minnesota State House Districts
February 21, 2012

**Duluth**

**Mankato/
North Mankato**

**Moorhead**

House Districts ▢ County ▢ County Subdivision ⌇ Indian Reservation – 🛡 - Interstate

2012 Minnesota Special Redistricting Panel
Minnesota State House Districts
February 21, 2012

**Rochester**

**St. Cloud**

House Districts County County Subdivision Indian Reservation Interstate