**[J-20-2022] [MO: Baer, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| CAROL ANN CARTER, MONICA PARRILLA, REBECCA POYOUROW, WILLIAM TUNG, ROSEANNE MILAZZO, BURT SIEGEL, SUSAN CASSANELLI, LEE CASSANELLI, LYNN WACHMAN, MICHAEL GUTTMAN, MAYA FONKEU, BRADY HILL, MARY ELLEN BALCHUNIS, TOM DEWALL, STEPHANIE MCNULTY AND JANET TEMIN, | : | No. 7 MM 2022 |
| | : | |
| Petitioners | : | ARGUED: February 18, 2022 |
| | : | |
| v. | : | |
| | : | |
| LEIGH M. CHAPMAN, IN HER OFFICIAL CAPACITY AS THE ACTING SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA; JESSICA MATHIS, IN HER OFFICIAL CAPACITY AS DIRECTOR FOR THE PENNSYLVANIA BUREAU OF ELECTION SERVICES AND NOTARIES, | : | |
| | : | |
| Respondents | : | |
| ---------------------------------------------------------- | : | |
| PHILIP T. GRESSMAN; RON Y. DONAGI; KRISTOPHER R. TAPP; PAMELA GORKIN; DAVID P. MARSH; JAMES L. ROSENBERGER; AMY MYERS; EUGENE BOMAN; GARY GORDON; LIZ MCMAHON; TIMOTHY G. FEEMAN; AND GARTH ISAAK, | : | |
| | : | |
| Petitioners | : | |
| | : | |
| v. | : | |

LEIGH M. CHAPMAN, IN HER OFFICIAL           :
CAPACITY AS THE ACTING SECRETARY            :
OF THE COMMONWEALTH OF                      :
PENNSYLVANIA; JESSICA MATHIS, IN            :
HER OFFICIAL CAPACITY AS DIRECTOR           :
FOR THE PENNSYLVANIA BUREAU OF              :
ELECTION SERVICES AND NOTARIES,             :
                                            :
                 Respondents                :

**CONCURRING OPINION**

**OPINION FILED:  March 9, 2022**
**DECIDED:  February 23, 2022**

**JUSTICE DOUGHERTY**

I join the majority opinion, but distance myself from certain aspects of part VI.B. Most significantly, I agree completely with the Court's selection of the Carter Plan for the primary and general elections for seats in the United States House of Representatives commencing May 17, 2022.  In my view, the Carter Plan is the correct choice because it effects the least change from the 2018 Plan, while also satisfying the various criteria we have established as the constitutional standard.

As the learned majority explains, the Carter Plan — together with several other plans submitted by the parties — meets the traditional core criteria established in *League of Women Voters of Pennsylvania v. Commonwealth*, 178 A.3d 737 (Pa. 2018) ("*LWV II*"), as the "floor" for a constitutionally valid redistricting plan.  *See* Majority Opinion at 27-33; *LWV II*, 178 A.3d at 817.  And, the Carter Plan — among others — satisfies additional metrics identified by the majority as "subordinate historical considerations."  *See* Majority Opinion at 34-36.  But a test utilizing these factors alone, acknowledged by the majority as being satisfied by multiple maps presented in this case, does little to advance a predictable judicial standard for circumstances like these, *i.e.*, where the Court is forced into the map-selecting business by a decennial impasse, and where multiple possible plans satisfy the floor criteria.  *Cf. Carter v. Chapman*, 7 MM 2022, 2022 WL 304580, at

*5 (Pa. Feb. 2, 2022) (Dougherty, J., concurring) ("[T]he people of this Commonwealth, as well as the other branches of government upon which the primary responsibility for drawing federal congressional districts rests, have a right to know what to anticipate should the judiciary be dragged into the process" including, *inter alia*, the "criteria that should guide a court's analysis."); *see id.* (imploring the Court to "shine as much light as possible on what many believe is an improperly political and unfairly partisan process").

Although the majority lands on the right answer, it fails to satisfactorily explain how it reaches that result. The majority appears to employ "a totality-of-the-circumstances analysis, where all conceivable factors, none of which is dispositive, are weighed with an eye to ascertaining" which plan is most "'fair.'" *Vieth v. Jubelirer*, 541 U.S. 267, 291 (2004) (plurality); *see* Majority Opinion at 39 ("Our task is to discern which plan, in our view, best abides by the traditional core criteria with attention paid to the subordinate historical considerations and awareness of partisan fairness."). Respectfully, while I fully support that goal, I also believe a more concrete standard is needed "to meaningfully constrain the discretion of the courts, and to win public acceptance for the court['s] intrusion into a process that is the very foundation of democratic decisionmaking." *Vieth*, 541 U.S. at 291; *see also id.* at 307 (Kennedy, J., concurring) ("With uncertain limits, intervening courts — even when proceeding with best intentions — would risk assuming political, not legal, responsibility for a process that often produces ill will and distrust.").

In my view, the critical factor that sets the Carter Plan apart  — the "tie-breaker," so to speak — is that the Carter Plan yields the least change from the Court's 2018 congressional redistricting plan. *See* Majority Opinion at 35 (acknowledging Carter Plan "laps the field" in terms of maintaining district lines). The least changed map is also the best choice where, as here, no one has demonstrated which subordinate historical considerations should outweigh the others, all maps are generally in the same acceptable

range, and we lack enough information about partisan fairness metrics to focus on those as the deciding factor.[1]

The majority correctly observes the Carter Plan ensures 86.6 percent of the Commonwealth's population falls in the same district as under the 2018 Plan. *See id.* Maintaining continuity for the vast majority of Pennsylvania residents is particularly important where, as here, the Court was forced to participate belatedly in what should have been an exclusively political process.[2] In this context, a light, transparent judicial touch is particularly advisable. I am also sensitive to the fact that Pennsylvania's voters have already had their districts changed twice since 2011, with a third realignment now made necessary by the population changes measured in the 2020 census.

Moreover, as noted by the majority, expert testimony established the 2018 Plan was "broadly recognized as a fair plan by those who study redistricting, following its use

---

[1] I fully agree with the majority's recognition that partisan fairness should be considered in our analysis. *See, e.g.*, Majority Opinion at 18 ("we conclude that consideration of partisan fairness, when selecting a plan among several that meet the traditional core criteria, is necessary to ensure that a congressional plan is reflective of and responsive to the partisan preferences of the Commonwealth's voters"); *id.* at 23 ("Partisan fairness metrics provide tools for objective evaluation of proposed congressional districting plans to determine their political fairness and avoid vote dilution based on political affiliation."); *id.* at 36, *quoting LWV II*, 178 A.3d at 814 ("we deem it appropriate to evaluate proposed plans through the use of partisan fairness metrics to ensure that all voters have 'an equal opportunity to translate their votes into representation.'"). However, I also recognize that the metrics for this criterion remain somewhat in flux when compared to the more standardized measures of the traditional core criteria. *See, e.g.*, *Vieth*, 541 U.S. at 307 (Kennedy, J., concurring) ("No substantive definition of fairness in [re]districting seems to command general assent."). Still, "[t]hat no such [partisan fairness] standard has emerged in this case should not be taken to prove that none will emerge in the future." *Id.* at 311.

[2] Notably, as I observed when we agreed to exercise extraordinary jurisdiction over this matter, "all parties concede the judiciary's involvement is not only appropriate at this point, but imperative." *Carter*, 7 MM 2022, 2022 WL 304580, at *2 n.1 (Dougherty, J., concurring) (citations omitted). Any hypothetical claim this Court lacks the authority to select a map has been irretrievably waived.

in the 2018 and 2020 elections," and the 2018 Plan "produce[d] relatively competitive elections with outcomes that are roughly in line with overall partisan preferences of Pennsylvania voters." *Id.* at 25 (internal quotation marks omitted). To me, it is eminently reasonable that we select the plan that hews as closely as possible to a prior district map we already know is constitutional and that has been proven through multiple election cycles to produce fair outcomes.[3]

Finally, I must express my personal frustration with the widely held misperception — promulgated disingenuously in the media as well as far too many courtrooms — that this Court somehow relishes the opportunity to play politics here. We decide this case not because we want to but because we have to as a result of the intransigent inability of the two other co-equal branches of government to fulfill their constitutional obligations and reach a compromise agreement. It is an unfortunate reality that when our Commonwealth's legislative and executive branches succeed only in creating a void, we have no choice but to step once again into the breach.

---

[3] I am not persuaded by arguments that the least change approach is exclusively relegated to situations where the prior map was legislatively enacted. Indeed, courts have recognized the approach is just as valid — if not more so — when the prior plan was court-made. *See, e.g.*, *Stenger v. Kellett*, 2012 WL 601017, at *3 (E.D. Mo. Feb. 23, 2012) ("A frequently used model in reapportioning districts is to begin with the current boundaries and change them as little as possible while making equal the population of the districts. . . . The 'least change' method is advantageous because it maintains the continuity in representation for each district and is by far the simplest way to reapportion[.]"); *Hippert v. Ritchie*, 813 N.W.2d 374, 380 (Minn. Special Redistricting Panel 2012) (explaining the panel utilizes a least-change strategy "where feasible" to avoid making political decisions that should be made by the legislature and governor); *Markham v. Fulton Cty. Bd. of Registrations & Elections*, 2002 WL 32587313, at *6 (N.D. Ga. May 29, 2002) (where prior districts were created by court order, court used that map as benchmark in drawing new map using a least-change methodology); *see also Johnson v. Wis. Elections Comm'n*, 967 N.W.2d 469, 496-97 (Wis. 2021) (Dallet, J., dissenting) (although "the least-change approach has no 'general acceptance among reasonable jurists' when the court's starting point is a legislatively drawn map . . .[,] when a court is redrawing maps based on a prior court-drawn plan, it may make sense to make fewer changes since the existing maps should already reflect neutral redistricting principles").